IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| **RIVERPOINT MANAGEMENT, LLC,** | ) | **CASE NO. 8:06CV301** |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **MEMORANDUM AND ORDER** |
| | ) | |
| **MARY KLEINHOLZ,** | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the Court on the Plaintiff's Application for a Preliminary Injunction (Filing No. 8). The Plaintiff is Riverpoint Management LLC ("Riverpoint"), a business that provides computer consulting and contracting services to its customers. (Filing No. 1, Complaint at ¶ 5). The Defendant, Mary Kleinholz, is a former employee of Riverpoint. (Id. at ¶ 9). The underlying issues in the case are whether Kleinholz engaged in unfair competition, including by disclosing Riverpoint's trade secrets and confidential information to Riverpoint's competitors in violation of state law; whether she breached any duty of loyalty that she may have owed to Riverpoint as her employer; and whether she converted Riverpoint's property.

The issue on the Riverpoint's Application is whether preliminary injunctive relief in its favor is warranted. The parties have fully briefed the matter (Filing Nos. 14, 35, and 40), and I have considered all the evidence, including those documents filed before the hearing in this case and the evidence received during the evidentiary hearing held on June 5, 2006.[1]

---

[1] In addition to the live testimony provided by Dominic Schilt, Rebecca Rosburg-Fields and Mary Kleinholz, the evidentiary record also includes Plaintiff's Exhibits 1-72, previously submitted at Filing Nos. 14 and 41; Plaintiff's Exhibits 73-90, which were offered and received during the hearing; the evidence filed with the Defendant's Index of Evidence at Filing No. 35; and Defendant's Exhibits 101-04.

As explained at the hearing, Riverpoint seeks a preliminary injunction requiring Kleinholz to return any confidential information belonging to Riverpoint that remains in her possession; to remove any electronic information belonging to Riverpoint that she continues to maintain on her home computer; and for an order restraining her from calling on Riverpoint's clients for a period of one year.

## FACTUAL BACKGROUND

Kleinholz began employment with Riverpoint on or about September 6, 2005. She was employed for approximately five and a half months before Riverpoint's President, Dominic Schilt, terminated her employment on February 20, 2006. Riverpoint alleges three main reasons for terminating Kleinholz's employment: 1) she failed effectively to perform her job duties; 2) she conducted personal business during work hours using company assets; and 3) she failed to abide by work rules, including keeping regular hours.

Before she became employed at Riverpoint, Kleinholz was a business development manager for a Riverpoint competitor known as Paragon. According to Kleinholz, before her first day of work at Riverpoint, its Vice-President of Operations, Jerry Keathley, e-mailed to her home e-mail account a list of Riverpoint's Omaha accounts by territory. (Ex. 103). Keathly agrees that he e-mailed the list to Kleinholz's personal e-mail address on or about September 6, 2005. (Ex. 103, Keathley Dep. at Ex. E.)

When Kleinholz was hired by Riverpoint, she signed an Employment and Confidentiality Agreement ("Agreement") (Ex. 1). The Agreement is dated August 23, 2005, although it is not clear what date it was executed by the parties. The Agreement contains provisions addressing Kleinholz's ability to compete against Riverpoint following

2

her termination, and her agreement to keep confidential certain proprietary information. (Ex. 1 at ¶¶ 4 and 5).

On January 3, 2006, Kleinholz contacted Andy Hawkins who is President of Riverpoint's main competitor, Concentric Corporation, to let him know where she was and what she was doing. (Ex. 13). Both she and Hawkins testified that such contacts are common in their industry, even among competitors. (Hawkins Dep. at 25, 74). Hawkins responded, and Kleinholz wrote back stating "Thing are going very well and busy! I am enjoying Riverpoint a lot. . . ." (Ex. 13)

On or about February 15, 2006, Kleinholz contacted Schilt and asked if he would agree to meet with her to discuss some problems that she believed had developed in Riverpoint's Omaha office. Schilt agreed to meet, and they scheduled an appointment for the morning of February 20, 2006. Kleinholz testified that during her conversation with Schilt on February 15, 2006, he cautioned her not to discuss their upcoming meeting with Keathley or Rebecca Rosburg-Fields, Riverpoint's recruiter. Kleinholz testified that it was in preparation for her meeting with Schilt that she forwarded some e-mails, including client lists and three candidate resumes, from her Riverpoint e-mail account to her home account, which is contrary to Riverpoint's policy. (Ex. 2). At the time that Kleinholz forwarded the e-mails to her home account, she knew that such actions violated company policy, and, for that reason, she told Schilt what she had done during their meeting on February 20. She explained that she wanted to keep her e-mail communications in preparation for the February 20th meeting confidential, and the only way she could print those e-mails without being noticed by Keathley or Rosburg-Fields was to send them to her home. Kleinholz testified that the Riverpoint information is still on her computer at home

and that she has not forwarded the information to, or used it as an employee of, Concentric.

One of the concerns Kleinholz raised at the February 20th meeting was her belief that she had fulfilled her responsibilities by bringing job openings to the company, but that Riverpoint's recruiter, Rosburg-Fields, had failed to place candidates in those job openings. Kleinholz wanted Schilt's permission to recruit so that she could find satisfactory candidates to fill the positions. In addition, Kleinholz expressed her dissatisfaction with Keathley's management style.

Before the meeting, Kleinholz expressed in an e-mail directed to her fiancé her feeling that if her meeting with Schilt went well, the Riverpoint office would turn-around and become profitable, but that if her meeting did not go well, she risked termination of her employment. (Ex. 46). After the meeting, Schilt consulted with Keathley, and Schilt made the decision to terminate Kleinholz's employment with Riverpoint. Schilt informed Kleinholz of his decision in the early afternoon of February 20, 2006.

At some time after Kleinholz left Riverpoint, Hawkins contacted her to obtain a personal and professional reference on a person whom Hawkins was considering as a new hire. (Ex. 90, Hawkins Dep. at 14-17). During that conversation, Hawkins asked Kleinholz how things were going for her at Riverpoint, and she told him she was no longer employed at Riverpoint. Hawkins testified that it was during that telephone conversation that he became interested in talking to Kleinholz about a position at Concentric. (*Id.* at 17). Kleinholz met with Hawkins' colleague at Concentric, and after that meeting, Hawkins offered Kleinholz a position at Concentric. She is now employed with Concentric as a Business Development Manager. As an employee of Concentric, Kleinholz was asked to,

and signed, an employment agreement. About a month after Kleinholz's termination, Keathley contacted Hawkins and confirmed that Kleinholz was working for Concentric.

## ANALYSIS

The Court's analysis of any application for a preliminary injunction requires the weighing of four factors:

> Whether a preliminary injunction is appropriate depends on four considerations: the probability that the movant will succeed on the merits; the threat of irreparable harm to the movant should the court deny the injunction; the balance between this harm and the harm that granting the injunction will cause to the other litigants; and the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc).

*Mid-America Real Estate Co. v. Iowa Realty Co., Inc.,* 406 F.3d 969, 972 (8th Cir. 2005). The burden of establishing the propriety of a preliminary injunction is on the movant. *Baker Elec. Co-op, Inc. v. Chaske*, 28 F.3d 1466, 1472 (8th Cir. 1994). "No single [*Dataphase*] factor in itself is dispositive; in each case all of the factors must be considered to determine whether on balance they weigh towards granting the injunction." *Baker Elec. Co-op*, 28 F.3d at 1472 (quoting *Calvin Klein Cosmetic Corp., v. Lenox Labs., Inc.,* 815 F.2d 500, 503 (8th Cir. 1987), and also citing *Dataphase*. The issuance of a preliminary injunction will be reversed only if the issuance "is the product of an abuse of discretion or misplaced reliance on an erroneous legal premise." *City of Timber Lake v. Cheyenne River Sioux Tribe,* 10 F.3d 554, 556 (8th Cir. 1993) *cert. denied* 512 U.S. 1236 (1994).

Riverpoint accuses Kleinholz of taking confidential and proprietary information such as client lists, consultant lists and resumes, territory information, and account information, and using these items, that it claims are trade secrets under Nebraska law, to take business away from Riverpoint. Riverpoint alleges that this constitutes unfair competition,

a breach of loyalty owed by Kleinholz to Riverpoint, and conversion with respect tp the forwarding of information from the Riverpoint e-mail system to her private e-mail account.

***Threat of Irreparable Injury***

Riverpoint argues that Kleinholz took information, including trade secrets, from Riverpoint in order to compete against Riverpoint.  Riverpoint argues that the theft of client lists constitutes the type of irreparable harm that justifies preliminary injunctive relief, citing to *E. W. Bliss Co., v. Struthers-Dunn, Inc.*, 408 F.2d 1108 (8th Cir. 1969).  While I agree that under certain circumstance, the disclosure of trade secrets may pose a threat of irreparable harm as was noted in *E.W. Bliss,* Riverpoint made no showing that irreparable injury may result from the activities undertaken by Kleinholz.

There is no evidence that the injury claimed to have been sustained by Riverpoint is more than theoretical or that there is some imminence to the threat of harm.  Riverpoint failed to show that there it lost any account because of Kleinholz's activities.  Riverpoint also failed to show that Kleinholz, in fact, has used any allegedly confidential information, including consultants' resumes, in any manner in her new position with Concentric to gain a business advantage over Riverpoint.  It is well settled that economic loss does not, in and of itself, constitute irreparable harm.  Based on the facts presented in this early stage of the litigation, I find no evidence supporting a finding that there exists an imminent threat of irreparable injury to Riverpoint.  See generally, *Packard Elevator v. I.C.C.* , 782 F.2d 112, 115 (8th Cir. 1986)(applying the *Dataphase* factors in the context of a stay pending judicial review.)

6

The Eighth Circuit Court of Appeals for the Eighth Circuit has recently affirmed the conclusion that "the failure of a movant to show irreparable harm is an 'independently sufficient basis upon which to deny a preliminary injunction,' and I shall deny the motion on that basis. *Blue Moon Entertainment, LLC v. Bates City,* 441 F.3d 561, 564 (8th Cir. 2006) (citation to unpublished district court opinion omitted.) In the interests of making a complete record, however, I will briefly discuss the other *Dataphase* factors.

### *Probability of Success on the Merits*

Riverpoint contends that it can demonstrate the probability of success on all four claims. Riverpoint alleges that Kleinholz engaged in unlawful use of trade secrets and engaged in unfair competition; breached a duty of loyalty to Riverpoint; and engaged in unlawful conversion. At this preliminary stage of the litigation, with only expedited discovery having been completed, I find limited evidence to support Riverpoint's claims against Kleinholz.

Riverpoint alleges in Count I that Kleinholz misappropriated confidential information in violation of the Nebraska Trade Secrets Act, Neb. Rev. Stat. §§ 87-501 to 507 (Reissue 1999). In *Selection Research, Inc. v. Murman,* 433 N.W.2d 526, 532 (Neb. 1989), the Nebraska Supreme Court examined the elements necessary to establish a cause of action for misappropriation of a trade secret. The elements are:

> (1) the existence of a trade secret or secret manufacturing process; (2) the value and importance of the trade secret to the employer in the conduct of his business; (3) the employer's right by reason of discovery or ownership to the use and enjoyment of the secret; and (4) the communication of the secret to the employee while he was employed in a position of trust and confidence and under circumstances making it inequitable and unjust for him to disclose it to others or to use it himself to the employer's prejudice.

*Id. See also*, *Richdale Development Co. v. McNeil Co., Inc.*, 508 N.W.2d 853, 859 (Neb. 1993). The Act defines "trade secret" to mean "information, including but not limited to, a drawing, formula, pattern, compilation, program, device, method, technique, code or process that (a) [d]erives independent economic value, actual or potential, from not being known to, and not being ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (b) [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy. Neb. Rev. Stat § 87-502(4)(a)(b). The Nebraska Supreme Court has stated that "the subject matter of a trade secret must be secret, that matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as its secret, and that a trade secret is something known to only a few and not susceptible of general knowledge." *Id.*

The Nebraska Supreme Court has recognized that a customer list can be a trade secret, but even so, the Nebraska Court is "reluctant to protect customer lists to the extent that they embody information that is readily ascertainable through public sources." *Home Pride Foods, Inc. v. Johnson*, 634 N.W.2d 774, 782 (Neb. 2001)(distinguishing between lists prepared after considerable time and effort to identify particular customers with particular needs or characteristics, from lists of mere identities and locations of customers that anyone could easily identify as possible customers.)

As I consider the elements of the claim and the definition of trade secrets, I am skeptical that the client and consultant lists at issue in this case actually constitute trade secrets because most of the information contained on them is available in the public domain, or alternatively, may be gained with a quick phone call to the company. I am

mindful of Kleinholz's testimony that many of the opportunities and job openings that she located were available via the Internet on sites such as *Careerlink* that may be accessed by anyone with an Internet connection. In addition to the general availability of the information, I find little evidence that the client and consultant lists gave or could give Riverpoint some competitive business advantage. Indeed, there is evidence that businesses in competition with Riverpoint are working to fulfill the needs of the same clients with some of the same consultants. There is no evidence of exclusive contracts with clients or with consultants. I appreciate Andy Hawkins's description: "My competitors work with the same clients that I work with, because my business is a relationship type business." (Hawkins Dep. at 62).

Even if I were to assume that the information at issue constitutes a trade secret, I am not persuaded that Riverpoint can carry its burden of showing that Kleinholz engaged in "unauthorized use of the secret." Certainly Kleinholz's testimony is that she has not used the information, and I see little evidence that she did. [2]

Based on the information before the Court, I conclude that the likelihood of Riverpoint's success on the merits of the trade secret claim does not weigh in favor of the issuance of a preliminary injunction. Because the emphasis on the unfair competition claim is that Kleinholz used the trade secrets to engage in unfair competition, the same analysis leads to the same conclusion. In addition, I am not persuaded that in the five and

---

[2] I am aware that Keathley has stated that two business clients and two consultants have reported that Kleinholz had contacted them, but it is not clear whether these contacts' names and numbers were available in the public domain. (Keathley Aff., Filing No. 16, ¶15).

a half months that Kleinholz was employed at Riverpoint, she had the time to generate for or syphon away, much, if any, of Riverpoint's goodwill.

With regard to Riverpoint's third claim, I conclude that there is a genuine issue as to whether Kleinholz breached a duty of loyalty to Riverpoint. The duty of loyalty arises out of the agent and principal relationship. "An agent and principal are in a fiduciary relationship such that the agent has an obligation to refrain from doing any harmful act to the principal." *Daubman v. CBS Real Estate Co.*, 580 N.W.2d 552, 559 (Neb. 1998). In this context, I find that there is evidence that Kleinholz, with at least a vague suspicion that her employment might soon be terminated (ex. 46) and with knowledge that her activity contravened Riverpoint's e-mail policy, forwarded information to her personal e-mail account from Riverpoint, including client and consultant lists and candidate resumes, such as Exs. 41 and 42. Kleinholz has refused Schilt's request that she delete and/or return the information. Riverpoint argues that "she used this information in order to communicate with Concentric, including about potential consultant placings, " but I find the evidence very thin on that last point. I conclude that the evidence is not sufficiently developed to show whether in fact Kleinholz has used the information in her employment with Concentric, which she denies, and, if she did, whether her actions proximately caused damage to Riverpoint.[3]

---

[3] Plaintiff also argues that Kleinholz's contact with Farm Credit while she was employed at Concentric is evidence of her breach. The undisputed evidence is that Farm Credit made a decision not to do business with Riverpoint because Farm Credit felt Riverpoint had lured some of its own employees away from Farm Credit. Thus, the evidence demonstrates that Farm Credit had made the decision not to deal with Riverpoint long before Kleinholz contacted Farm Credit on behalf of Concentric.

With regard to the cause of action alleging conversion, I find that there is no evidence that Kleinholz deleted or removed information from her Riverpoint e-mail account or from any other Riverpoint files or folders. While Kleinholz may have retained her personal notes or "paper files," there is no evidence that she took any business files from Riverpoint, because its files were maintained electronically. The paper files, some of which Riverpoint believed to exist but which are currently missing, appear to have been maintained at the discretion of individual Riverpoint employees. For these reasons, I conclude that the likelihood of Riverpoint's success on the conversion claim weighs against the issuance of injunctive relief.

For all these reasons, I conclude that the likelihood that Riverpoint will succeed on the merits of the four claims asserted in the Complaint weighs against issuance of a preliminary injunction.

***Balance of Harms and Public Interest***

I conclude that the balance of harms does not strongly weigh in either party's favor. The industry at issue involves identifying client needs and trying to place an appropriate candidate with the client to satisfy those needs. To the extent that Kleinholz would be enjoined from engaging in her livelihood, she would undeniably suffer some harm and Riverpoint would benefit from the lack of her competition. In this case, however, I am most interested in the harm that may exist to third parties, specifically the candidates who trusted Riverpoint and perhaps Kleinholz with their resumes. Unfortunately, the evidence is not sufficiently developed for the Court to make any informed decision regarding whether any candidate resume is being used in any manner that might adversely affect these interested third parties. I cannot ignore the reality that these candidates' aim, presumably, is for a

11

successful placement.  For all these reasons, I conclude that this factor weighs slightly against the issuance of an injunction.

The public interest is served by preserving fair competition and also by protecting trade secrets.  Based on the analysis contained in this Memorandum and Order, I conclude that the public interest weighs against granting a preliminary injunction under the facts of this case.

## CONCLUSION

Because I conclude that the Plaintiff has failed to show the threat of irreparable harm absent the issuance of a preliminary injunction, I will deny the application.  In addition, I conclude that all the *Dataphase* factors weigh against the issuance of a preliminary injunction in this case.  For all these reasons,

IT IS ORDERED:

The Plaintiff's Application for a Preliminary Injunction (Filing No. 8) is denied.

Dated this 12th day of June 2006.

BY THE COURT:

s/Laurie Smith Camp  
United States District Judge